UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
:
MARC A. PERGAMENT, as Trustee for the
Estate of TRACY M. WORTHY,                              :

                Plaintiff,            :        **DECISION AND ORDER**
                                                              :
        - against -                      :        2:03-cv-01106-ENV-AKT
                                                              :
FEDERAL EXPRESS CORPORATION,         :
                                                              :
                Defendant.            :
                                                              :
-----------------------------------------------------------------X

**VITALIANO, D.J.**

        Tracy M. Worthy ("Worthy"),[1] an African-American female, brings this action pursuant

to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. ("Title VII"),

42 U.S.C. § 1981, the Equal Pay Act, 29 U.S.C.§ 206(d)(1)("EPA"), and Article 15 of the New

York State Human Rights Law ("NYSHRL") against Federal Express Corporation ("FedEx"),

her former employer.  Worthy alleges that FedEx discriminated against her on the basis of her

race and sex by subjecting her to disparate treatment, by failing to promote her, by retaliating

against her for filing a prior complaint of employment discrimination, and, ultimately, by

terminating her employment with FedEx.  Defendant now moves for summary judgment

pursuant to Federal Rule of Civil Procedure 56.

---

[1]Worthy filed for bankruptcy under Chapter 7 in December 2000.  Marc A. Pergament, the trustee in
bankruptcy for Worthy's estate, has since been substituted for Worthy as the plaintiff in this action by stipulation of
the parties.  *See* Docket Entry No. 21 (stipulation "so ordered" by Judge Thomas C. Platt on January 18, 2005).
However, in order to avoid confusion, the Court will refer to plaintiff as "Worthy", and vice versa, throughout this
decision.

# FACTUAL BACKGROUND

Unless otherwise indicated, the following facts are considered by the Court to be undisputed.[2]

Worthy was hired by FedEx on August 6, 1984. She served first as a customer service agent and then as a foot courier. In February 1986, Worthy was promoted to service agent, becoming a senior service agent later that year. These promotions were followed in relatively short succession by her promotion to junior manager in June 1989, to operations manager in September 1989, and to service assurance manager in June 1995. All of these positions were located at FedEx stations in Nassau and Suffolk counties. Def.'s Rule 56.1 Stmt. ¶ 1; Pl.'s Rule 56.1 Counter-Stmt. ¶ 4.

In December 1996, Worthy was promoted again, this time to senior manager of station operations at FedEx's Mount Vernon station.[3] Worthy asserts that the Mount Vernon station, which is located in Westchester County and services Westchester and Bronx counties, is known

_____

[2]The Court notes that under the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, the party moving for summary judgment is required to submit a "separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local Civ. R. 56.1(a). The party opposing the motion must then submit papers containing "a *correspondingly numbered paragraph* responding to each numbered paragraph in the [Rule 56.1(a)] statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." Local Civ. R. 56.1(b)(emphasis added). Defendant complied with this rule by submitting a numbered "Rule 56.1 Statement" with its notice of motion. However, although plaintiff subsequently submitted a "Rule 56.1(b) Counter Statement" in response to defendant's Rule 56.1(a) statement, plaintiff's numbered factual allegations do not correspond, in any way, with defendant's numbered paragraphs as is specifically mandated by Local Rule 56.1(b). This is a significant oversight inasmuch as it makes the Court's primary task in deciding a summary judgment motion - - determining whether genuine issues of material fact exist - - considerably more difficult. Indeed, it is grounds in itself for deeming the defendant's factual allegations admitted. *See* Local Civ. R. 56.1(c)(providing that "[e]ach numbered paragraph in the statement of material facts . . . required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party"). However, in recognition of the law's preference for resolution of disputes on their merits and not through technicalities, the Court will instead conduct its own review of the record in deciding the motion.

[3]Although the letter awarding Worthy this promotion was dated December 13, 1996, Worthy apparently did not begin her new position until sometime in 1997. *See generally* Def.'s App., Vol. 2, Ex. 8.

as a particularly difficult facility to oversee due to its space constraints, high turnover, and the fact that its assigned delivery zone encompasses high-crime areas into which its couriers are sometimes reluctant to venture. Def.'s Rule 56.1 Stmt. ¶ 13; *see generally* Pl.'s Rule 56.1 Counter-Stmt. Plaintiff's responsibilities in her new position included "plan[ning], organiz[ing], direct[ing], and control[ling] all operations within the service area of the station in a way that provi[d]es maximum service to customers while maintaining a cost effective station operation." Def.'s App., Vol. 2, Ex. 10.

As the senior manager at the Mount Vernon facility, Worthy ranked in the corporate hierarchy directly below managing director Cathy Walton ("Walton"), an African-American female who oversaw all of the FedEx facilities located within the company's Hudson district. When Walton left in early 1997, after supervising Worthy for only a month, Walton's position as managing director was taken over by Michael Fichera ("Fichera"), a white male. Worthy reported to Fichera for approximately two years. During this time, she received three performance evaluations from Fichera in which he rated her a 3.0, 3.3, and a 3.0 out of 4.0 - - reasonably positive scores by FedEx standards. In these evaluations, Fichera generally praised Worthy for her performance in dealing with the special challenges posed by the Mount Vernon facility; at the same time, however, he expressed some concern about her very abrasive management style, which he believed negatively impacted employee morale. Def.'s Rule 56.1 Stmt. ¶ 14; Def.'s App., Vol. 2, Ex. 11; Pl.'s Rule 56.1 Counter-Stmt. ¶¶ 5, 6.

In June 1999, following a regional reorganization, Fichera ceased to be Worthy's managing director when the Mount Vernon facility, previously assigned to the Hudson district, was re-assigned to FedEx's Long Island district. As a result, Nanette Malebranche

("Malebranche"), an Hispanic female who had served as the managing director of the Long Island district since 1997, became Worthy's managing director. Malebranche and Worthy had met previously, in 1989, when they both were serving as managers at different stations. Malebranche had also had some communications, albeit indirect, with Worthy in 1997 following Malebranche's participation in an investigation of an accident involving an African-American FedEx driver who happened to be the father of Worthy's son. In a written report on the incident, Malebranche had recommended the driver's discharge. Worthy took offense to this report, particularly since Malebranche had referred to Worthy in the report as the driver's "common law wife". Malebranche testified that, upon receiving a call from Fichera notifying her of Worthy's complaints, she had removed the offending terminology from the report. The record does not indicate any other significant interactions between the two women prior to the 1999 reorganization which effectively made Malebranche Worthy's direct supervisor. Def.'s Rule 56.1 Stmt. ¶¶ 14, 16; Pl.'s Rule 56.1 Counter-Stmt. ¶¶ 8, 100, 101; Malebranche Dep. at 21, 33-35.

On March 7, 2000, Malebranche issued a warning letter to Worthy for violating FedEx's Acceptable Conduct Policy. This was the second such letter[4] Worthy had received during her time as a senior manager. In this letter, Malebranche cited Worthy's "leadership failure" in neglecting to discipline and terminate an employee in her station who had been found to have

---

[4]Pursuant to FedEx's Personnel Policy and Procedure Manual, also known as its PEOPLE Manual, "reminder letters" are given for performance issues while "warning letters" are given for behavioral issues. If three reminder and/or warning letters are given within any 12-month period, the recipient can be terminated. *See* Ressler Decl., Ex. 1 (noting that "termination normally results upon receipt of [ ] three unsatisfactory performance reviews, or [ ] three performance reminders, or [ ] a combination of any type of notification (including warning letters for misconduct) totalling 3 within a 12-month period"). Worthy had received her first such warning letter as a senior manager on June 2, 1997 from her former supervisor, Fichera, who chastised Worthy for interfering with a security investigation involving an acquaintance working at another FedEx facility. Def.'s App., Vol. 2, Ex. 26. However, this letter had been issued more than 12 months before the second letter.

falsified signature release scans on several occasions. Malebranche concluded by reminding Worthy that the letter would remain active in her personnel file for 12 months and that two more such disciplinary notifications within that period could result in her termination. Def.'s Rule 56.1 Stmt. ¶ 20; Def.'s App., Vol. 2, Ex. 13.

Worthy's problems were soon compounded by negative reports provided by her subordinates to FedEx management. First, Worthy received a low Survey Feed Back ("SFA") score from the managers she supervised. Second, an anonymous letter, apparently authored by lower-level employees at the Mount Vernon facility, was mailed to FedEx headquarters in Memphis, Tennessee in March 2000. The letter alleged that working with Worthy was "hell" in that she "belittles couriers and managers," "has no respect for anyone," and "threatens every one of [our] jobs and careers." The writers concluded by encouraging headquarters to "impeach" Worthy - - whom they termed "the disease with [a] cure" - - before they took the matter into their own hands. Despite the threatened revolt, FedEx management took no immediate action regarding Worthy's employment. Def.'s Rule 56.1 Stmt. ¶ ¶ 21, 22; Def.'s App., Vol. 2, Ex. 11, 24.

On May 31, 2000, Malebranche gave Worthy a 30-day notice to turn around the Mount Vernon facility, which was continuing on its track of poor performance. Compl. ¶ 17. Worthy received a follow-up interoffice memorandum the next day from Malebranche recapping the concerns and issues they had discussed during their May 31st meeting, including Worthy's low SFA results and the high number of vehicle accidents at the station. Malebranche also cited several areas in which she believed that Worthy's submitted action plans were insufficient. For example, she noted that Worthy had not adequately addressed the issue of overall service at the

station, which had been on a significant and "steady downward trend" since the previous April. Malebranche ordered Worthy to submit, by June 6, 2000, an updated action plan for each of the problem areas. Def.'s App., Vol. 2, Ex. 27.

Worthy apparently did so, as Malebranche sent Worthy another interoffice memorandum, on June 7, 2000, commending her on her revised action plans. At the same time, however, Malebranche warned Worthy in the memorandum that "this is not about the next 30 days, the last 30 days or three months. It is about your trending performance and the performance of the station for the last 13 months under your leadership." Malebranche further observed that, although she had discussed these performance deficiencies with Worthy on "numerous occasions," Worthy had not been receptive to Malebranche's suggestions for improvement - - such as replacing the congested station's Grumman vehicles with smaller and more maneuverable Econoline vans. Worthy, apparently upset over Malebranche's criticisms, refused to sign the line acknowledging that she had received the memorandum. That same day, Malebranche issued Worthy a "documented counseling" letter for missing her station's service goals for the seventh consecutive week. Malebranche ended the letter with the following warning: "This letter serves as notification that should you fail to meet your goal in the future, further disciplinary action may occur." Def.'s App., Vol. 2, Ex. 28, 29.

Later that month, Malebranche completed Worthy's annual employment evaluation in which she rated Worthy a less-than-impressive 1.8. In the accompanying comments section, Malebranche ascribed the Mount Vernon station's problems in large part to Worthy and added that "[Worthy] has trouble accepting responsibility for her actions/mistakes . . . . [she] needs to accept constructive criticism better and allow herself to be coached." Malebranche also alluded

to the fact that managers and lower-level staffers were dissatisfied with Worthy's abrasive management style, noting that Worthy needed to make improving communications with employees an overall priority. Def's App., Vol. 2, Ex. 11.

Two days later, on June 28, 2000, Malebranche sent Worthy a reminder letter regarding her low annual evaluation and her "overall poor performance." In the letter, Malebranche noted that "[p]resently the [Mount Vernon] station, under your leadership, is achieving only one of its [domestic ground operations] goals and there has been minimal or no improvement during the past four (4) months in these critical performance areas." She concluded by advising Worthy that "this is your second letter on file" and that, pursuant to FedEx policy, one more such warning/reminder letter could result in her termination. Def.'s App., Vol. 2, Ex. 12.

Worthy refused to sign or acknowledge both the review and the reminder letter. Instead, she filed a complaint of discrimination, partially based on race, against Malebranche via FedEx's internal Guaranteed Fair Treatment Procedure ("GFTP")/EEO process. On July 5, 2000, Worthy was informed that an investigation would be conducted into her complaints. Def.'s Rule 56.1 Stmt. ¶ 30; Def's App., Vol. 2, Ex. 11, 20.

Worthy, however, was soon dealt another blow. On July 20, 2000, Jo Thomas ("Thomas"), an operations manager at the Mount Vernon facility, sent a letter to Malebranche, via the human resources department, in which she strongly criticized Worthy's leadership. Thomas complained that, due to "[t]he atmosphere Worthy is creating," the morale of both managers and hourly employees was abysmal. Thomas asserted that Worthy belittled her and the other managers constantly with "a barrage of vulgar, abusive language and comments," played favorites, and otherwise offered managers no support in their efforts to turn the station around.

Malebranche did not personally take part in the subsequent investigation into the validity of Thomas' complaints.  Def.'s Rule 56.1 Stmt. ¶ 29; Def.'s App., Vol. 2, Ex. 25.

On August 9, 2000, Worthy received another documented counseling letter from Malebranche regarding the Mount Vernon facility's deficient performance.  Malebranche noted that despite her repeated warnings, the station's performance had not only not improved over the preceding weeks, but was actually getting "progressively worse" in a number of critical areas. Malebranche ended the letter on an ominous note, writing that "[a]t this time I must advise you that immediate improvement is required in order to avoid further disciplinary action."  In response, Worthy filed, on August 16, 2000, a second GFTP complaint against Malebranche alleging retaliation and discrimination on the basis of race and marital status.[5]  Def.'s App., Vol. 2, Ex. 15, 31.

On August 21, 2000, Malebranche issued Worthy yet another documented counseling letter addressing the Mount Vernon facility's "unacceptable" number of package missorts. Malebranche noted that the station's numbers in this area were considerably higher than comparable stations and that this, in turn, was having an impact on "bottom line profits" as the average cost to FedEx of each missorted package was $26.50.  In a response memorandum, dated August 24, 2000, Worthy acknowledged her station's overall poor performance, but attributed it primarily to her problems in retaining experienced employees in various departments.  Worthy promised to work with her managers in order to improve the facility's overall operational structure.  Def.'s App., Vol. 2, Ex. 32-33.

On September 13, 2000, however, Malebranche sent Worthy her third - - and final - -

---

[5]Worthy was apparently referring to her status as a single mother.

warning letter. The letter contained the following language:

> . . . as a result of an investigation by Personnel it has been deemed that your behavior as senior manager of FedEx was unacceptable. As a result you are being issued this Warning Letter for Leadership Failure as outlined in the Acceptable Conduct Policy (2-5). This is your third letter within a 12-month period and in accordance with policy (2-5/2-50) your employment with FedEx is being terminated immediately.[6]

The letter also informed Worthy of her right to appeal her termination through the internal GFTP process. Def.'s App., Vol. 2, Ex. 14.

On September 14, 2000, Worthy did so, filing a "Step 1 GFTP Form For Terminated Employees." In the "comments" section of this form, Worthy complained that she was fired not because of the station's lackluster performance under her leadership but because Malebranche had a "vendetta" against her: "[P]lain [and] simple [Malebranche] never did like me [and] wanted me out by termination." Worthy also alleged that Malebranche was "racist" and, by firing her, was protecting the "jobs of white senior managers in her district." Def's App., Vol. 2, Ex. 17.

Worthy's termination was affirmed at all three levels of FedEx's GFTP appeals process. In a letter dated October 13, 2000, FedEx Eastern Region Vice President Thomas Lynch ("Lynch") first addressed Worthy's June 28, 2000 complaint against Malebranche regarding her low performance evaluation, upon which a decision had not yet been rendered due to the ongoing

---

[6]Policy 2-5 of Fedex's PEOPLE Manual, otherwise known as the "Acceptable Conduct Policy," sets conduct expectations for all FedEx employees. Unacceptable conduct would include, for instance, "[t]hreatening, intimidating, coercing, directing abusive language, or displaying blatant or public disrespect toward any employee or customer while on duty, on Company property, at collection sites, or at off-site Company meetings and functions." "Leadership failure of a member of management" is also classed as "misconduct." Policy 2-5 provides for the discipline and/or termination of any employee who violates these standards, depending on the severity of the underlying infraction[s]. *See generally* FedEx Acceptable Conduct Policy, Def's Rule 56.1 Stmt., App., Vol. 2, Ex. 22.

investigation. Lynch stated, in sum, that the evaluation was justified due to the station's slipping performance. He also noted that there was no evidence to support Worthy's allegation that Malebranche was "out to get" her, especially in light of the fact that two of Worthy's previous managing directors had also expressed some concern over her performance and abrasive demeanor. Lynch then turned to the issue of Worthy's termination:

> As the result of a complaint[7] an investigation was conducted regarding your behavior and conduct as a Sr. Manager. The results of this investigation provided that you had in fact acted in an unprofessional manner on more than one occasion with more than one employee through your words and your actions. There was a preponderance of evidence as a result of this investigation that indicated you have in fact used public reprimands and humiliation when dealing with subordinates and that your improper method of communication resulted in a general poor employee relations climate. On the basis of our review, we are upholding your Warning Letter/Termination.

Worthy appealed this decision to the FedEx Appeals Board, the final step in the FedEx GFTP process. The Appeals Board upheld Lynch's determination in a letter dated November 9, 2000. Four days later, FedEx extended Worthy a severance package, which she declined. Def.'s App., Vol. 2, Ex. 19, 20, 21.

On January 16, 2001, Worthy filed a charge of discrimination with the New York State Department of Human Rights ("SDHR"), alleging that FedEx had discriminated against her on account of her race and sex and had terminated her in retaliation for her prior complaints regarding such discrimination. This complaint was forwarded in due course to the Equal Employment Opportunity Commission ("EEOC"), which subsequently issued Worthy a right to

---

[7]Lynch was apparently referring to the July 20, 2000 complaint filed by Operations Manager Jo Thomas, although by this date FedEx management was also in possession of the March 2000 letter sent to headquarters by lower-level staffers at the Mount Vernon station.

sue letter.  Def.'s App., Vol. 2, Ex. 34; Compl. ¶ 4.

Worthy filed the instant action on March 5, 2003.  As she did in her SDHR complaint, Worthy alleges that FedEx discriminated against her on the basis of her race and sex in violation of Title VII, § 1981, and Article 15 of the New York State Human Rights Law by subjecting her to disparate treatment, by failing to promote her, by retaliating against her for filing prior complaints of employment discrimination, and, ultimately, by firing her.  Worthy also alleges violations of the Equal Pay Act based on her assertion that at the time of her termination she was being paid less than male senior managers in the Long Island district.

Defendants now move for summary judgment on all claims.


**DISCUSSION**

### I.  Standard for Summary Judgment

Under the Federal Rules of Civil Procedure, a district court must grant summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The Court's responsibility in assessing the merits of a summary judgment motion is thus not to try issues of fact, but rather to "determine whether there *are* issues of fact to be tried." *Sutera v. Schering Corp*., 73 F.3d 13, 16 (2d Cir. 1995) (quoting *Katz v. Goodyear Tire & Rubber Co.*, 737 F.2d 238, 244 (2d Cir. 1984)). Accordingly, the moving party bears the burden of demonstrating that there is no genuine issue as to any material fact, *see, e.g., Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005),

and the evidence presented will be construed liberally in favor of the party opposing the motion. *See, e.g., Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

Once the moving party has met its initial burden of demonstrating the absence of a disputed issue of material fact, the burden then shifts to the nonmoving party to present "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). However, the non-moving party may not rely solely on "conclusory allegations or unsubstantiated speculation" in order to defeat a motion for summary judgment. *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998). Thus, if the evidence favoring the nonmoving party is "merely colorable . . . or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)(*see also Gallo v. Prudential Residential Servs. Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The Court also notes that it must be particularly cautious about granting summary judgment to an employer in a discrimination case such as this in which the employer's intent is in question. *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985); *McLee v. Chrysler Corp.*, 38 F.3d 67, 68 (2d Cir. 1994). "Because direct evidence of an employer's discriminatory intent will rarely be found, 'affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'" *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997)(citing *Gallo*, 22 F.3d at 1224). However, this extra exercise of caution does not, by any means, render summary judgment unavailable to a defendant in a discrimination case. Summary judgment must be granted if, based on the evidence presented, no reasonable trier of fact could conclude that discrimination was a determinative factor in the defendants' actions.

*See, e.g., Schnabel v. Abramson*, 232 F.3d 83, 91 (2d Cir. 2000).  It may also be entered in a discrimination case "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Morris*, 2003 WL 1739009 at *3 (citing *Anderson*, 477 U.S. at 247); *see also Meiri*, 759 F.2d at 998 ("[t]o allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all [discrimination] cases").

## II.  General Analysis of Allegations of Employment Discrimination under Title VII

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981), the Supreme Court set forth the burden-shifting analysis that courts are required to apply when analyzing Title VII discrimination claims.[8]  To establish a prima facie case of employment discrimination, a plaintiff must demonstrate that (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified

---

[8]The Court notes that this same analysis applies to the plaintiffs' claims asserted pursuant to 42 U.S.C. § 1981 and the NYSHRL.  *See, e.g. Choudhury v. Polytechnic Inst. of New York*, 735 F.2d 38, 44 (2d Cir. 1984)(observing that the "same elements constitute a claim for employment discrimination under § 1981 as under Title VII"); *Schiano v. Quality Payroll Systems, Inc.*, 445 F.3d 597, 609 (2d Cir. 2006)(stating that claims under the NYSHRL are "generally governed by the same standards as federal claims under Title VII").  However, because § 1981 only prohibits race discrimination in the making of contracts (a prohibition which extends to the discriminatory termination of an employee) and does not prohibit gender discrimination, defendant's motion for summary judgment must be granted to the extent Worthy asserts gender discrimination under § 1981.  *Lauture v. Int'l Bus. Machs. Corp.*, 216 F.3d 258, 260-61 (2d Cir. 2000); *Anderson v. Conboy*, 156 F.3d 167, 170 (2d Cir. 1998).

for her position; (3) the plaintiff suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. _McDonnell Douglas_, 411 U.S. at 802; _see also Reeves v. Sanderson Plumbing Products, Inc._, 530 U.S. 133, 142 (2000); _James v. New York Racing Ass'n_, 233 F.3d 149, 153-54 (2d Cir. 2000).

Once the plaintiff has successfully established a prima facie case, the court presumes that the employer unlawfully discriminated against the plaintiff. _Fisher v. Vassar College_, 114 F.3d 1332, 1335 (2d Cir. 1997). The burden of production then shifts to the defendant to offer a legitimate, nondiscriminatory rationale for its actions. _McDonnell Douglas_, 411 U.S. at 802-03; _St. Mary's Honor Ctr. v. Hicks_, 509 U.S. 502, 506-07 (1993); _see also Fisher_, 114 F.3d at 1335-36. The defendant's rationale must be supported by admissible evidence which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action. _St. Mary's_, 509 U.S. at 507. In this respect, "[a]ny legitimate, non-discriminatory reason will rebut the presumption triggered by the prima facie case. The defendant need not persuade the court that it was actually motivated by the proferred reasons." _Morris v. New York City Dep't of Sanitation_, 2003 WL 1739009, at *3 (S.D.N.Y. Apr. 2, 2003) (internal citations omitted); _see also Reeves_, 530 U.S. at 143 (noting that "[t]his burden is one of production, not persuasion; it can involve no credibility assessment").

If the defendant is able to put forth evidence of a nondiscriminatory basis for the action, the presumption of discrimination "drops out of the picture." _St. Mary's_, 509 U.S. at 510-11. The burden then shifts back to the plaintiff to demonstrate, by a preponderance of the evidence, that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext

for discrimination." *Burdine*, 450 U.S. at 253; *Fisher*, 114 F.3d at 1337.  The Supreme Court has clarified that in meeting this burden, a plaintiff must show "*both* that the reason was false, *and* that discrimination was the real reason" for the employer's decision.  *St. Mary's*, 509 U.S. at 515 (emphasis in original).  "In the summary judgment context, this means that the plaintiff must establish a genuine issue of material fact either through direct, statistical or circumstantial evidence as to whether the employer's reason for [the adverse action] is false *and* as to whether it is more likely that a discriminatory reason motived the employer to make the adverse employment decision."  *Morris*, 2003 WL 1739009 at *4 (citing *Taggart v. Time Inc.*, 924 F.2d 43, 46 (2d Cir. 1991)).  The Court of Appeals for the Second Circuit has specifically instructed that a court deciding a summary judgment motion is to use a "case by case" approach that evaluates "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports [or undermines] the employer's case."  *James*, 233 F.3d at 156 (quoting *Reeves*, 530 U.S. at 148-49).  In determining whether a plaintiff has established such a genuine issue of fact, the Court must keep in mind that "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Reeves*, 530 U.S. at 143.  If the plaintiff does not show that evidence exists that would allow a rational factfinder to infer that the employer's rationale is pretextual, summary judgment is appropriate.  *See Smith v. American Express Co.*, 853 F.2d 151, 154-55 (2d Cir. 1988).

### III.  Plaintiff's Claims Regarding Discriminatory Discharge

#### a.  Prima Facie Case

The Court will first address Worthy's claims concerning her termination from FedEx.   In order to establish a prima facie case of discriminatory discharge under the relevant variation of the _McDonnell Douglas_ analysis, a plaintiff must show: 1) that she belongs to a protected class; 2) that she was competent to perform the job or that she was performing her duties satisfactorily; 3) that she was discharged; and 4) that her discharge occurred under circumstances giving rise to an inference of discrimination.   _Mario v. P & C Food Markets, Inc._, 313 F.3d 758, 767 (2d Cir. 2002); <u>Olle v. Columbia Univ.</u>, 332 F. Supp. 2d 599, 615 (S.D.N.Y. 2004).  For purposes of this motion, FedEx does not dispute that Worthy, as an African American and a female, is a member of protected classes, and that she was discharged, thus satisfying the first and third prongs of her prima facie case for discriminatory discharge under the _McDonnell Douglas_ analysis.  FedEx does, however, dispute Worthy's assertion that she has established the second and fourth prongs.

With regard to the second prong, FedEx argues that Worthy was not performing her job satisfactorily in that she had recently received a low performance evaluation as well as three reminder/warning letters for performance and behavioral deficiencies.  As such, FedEx concludes, Worthy was not meeting her employer's legitimate expectations at the time of her termination, and, accordingly, her entire prima facie case must fail.  Def.'s Mem. in Supp. at 9.

The Court, however, observes that Worthy's burden at the prima facie stage is "minimal." _Hollander v. American Cyanamid Co._, 172 F.3d 192, 199 (2d Cir. 1999); _see also_ _Chambers v._ _TRM Copy Ctrs. Corp._, 43 F.3d 29, 37 (2d Cir. 1994).  To this end, the Second Circuit has "long emphasized that the qualification prong must not be interpreted in such a way as to shift into the

plaintiff's prima facie case an obligation to anticipate and disprove the employer's proffer of a legitimate, non-discriminatory basis for its decision." _Olle_, 332 F. Supp. 2d at 615 (internal citations omitted); _see also_ _Owens v. New York City Housing Auth._, 934 F.2d 405, 409 (2d Cir. 1991)(noting that "_McDonnell Douglas_ requires only a minimal showing of qualification to establish a prima facie claim . . . . We have no doubt that . . . misconduct may certainly provide a legitimate and non-discriminatory reason to terminate an employee. This misconduct is distinct, however, from the issue of minimal qualification to perform a job. An individual may well have the ability to perform job duties, even if her conduct on the job is inappropriate or offensive."); _Sista v. CDC Ixis North America, Inc._, 445 F.3d 161, 171-72 (2d Cir. 2006). Accordingly, at this stage of the analysis a plaintiff need only demonstrate that she "possesses the basic skills necessary for the performance of her job" and not that her "performance was flawless or superior." _de la Cruz v. New York City Human Res. Admin. Dep't of Soc. Servs._, 82 F.3d 16, 20 (3d Cir. 1996)(internal citations omitted); _see also_ _Olle_, 332 F. Supp. 2d at 615.

The Second Circuit has observed that such a showing of qualification is particularly easy to find in discriminatory termination cases:

> In a discharge case in which the employer has already hired the employee into the job in question, the inference of minimal qualification is, of course, easier to draw than in a hiring or promotion case because, by hiring the employee, the employer itself has already expressed a belief that she is minimally qualified. Moreover, when . . . the employer has retained the plaintiff for a significant period of time and promoted her, the strength of the inference that she possesses the basic skills required for her job is heightened.

_Gregory v. Daly_, 243 F.3d 687, 696 (2d Cir. 2001); _cf._ _Augustin v. Yale Club of New York City_, 2006 WL 2690289, at *23 (S.D.N.Y. Sept. 15, 2006)(finding that "[d]ue to the fact that

[d]efendant hired, promoted, and retained [p]laintiff for a significant period of time, [p]laintiff has sufficiently pled the second prong of her prima facie . . . claim, that she was qualified for the position"). Here, because FedEx had hired Worthy in 1984 as a customer service agent and had steadily promoted her through the ranks, at least until she attained the position of senior manager in 1997, the Court finds that plaintiff was, at a minimum, qualified for her position. Worthy has thus met the second requirement of her prima facie case under *McDonnell Douglas*.

Notwithstanding success on the first three prongs, however, the Court finds that Worthy is unable to make out the fourth element because she has not shown that her final warning letter and termination occurred under circumstances giving rise to an inference of discrimination on the basis of her sex or race. Worthy's allegations of racism and sexism by her superiors - - and in particular, Malebranche - - are, for the most part, highly conclusory and completely unsupported by record evidence. Indeed, Worthy's "evidence" in this respect consists primarily of her own speculation - - as well as that of Mary Anne Leach ("Leach"), a former coworker and friend - - that Worthy's race and sex, and not the dismal performance of the station she supervised, must have been the "true" reasons behind Malebranche's decision to terminate Worthy. For example, although Leach claims that Malebranche was "after people of color" and thus derived particular joy out of terminating African-Americans, *see* Leach Dep. at 60, 139, neither Leach nor Worthy have provided the Court with any direct, circumstantial, or statistical corroboration whatsoever for these conclusory allegations.[9] As such, these statements on their own are not sufficient to

---

[9]The following exchange, which occurred when Leach was asked to provide specific examples of Malebranche's racism and sexism, is particularly representative of the conclusory nature of plaintiff's allegations in this regard:

Leach: . . . [I] wouldn't have enough cases because it wasn't that many to start with. However, [my impression of racism] was strictly based on the culture [and] the environment, and you know, I can't give you the specifics that you're looking for like the names and the dates.

create a genuine issue of material fact for trial regarding Malebranche's motivations for firing Worthy. *See, e.g., Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980)(noting that "[t]he litigant opposing summary judgment . . . 'may not rest upon mere conclusory allegations or denials' as a vehicle for obtaining a trial. Rather, [she] must bring to the court's attention some affirmative indication that [her] version of relevant events is not fanciful.")(internal citations omitted); *Alfieri v. SYSCO Food Servs.*, 192 F. Supp. 2d 14, 20 (W.D.N.Y. 2001)(observing that it is well-settled that "[f]or a plaintiff in a discrimination case to survive a motion for summary judgment, he or she must do more than present conclusory allegations of discrimination . . . he or she must offer concrete particulars to substantiate the claim")(internal citations omitted).

Moreover, the Court finds that what Worthy does provide in support of her allegations

---

Questioner: But you just felt the culture was not good for you [as an African-American woman]?
Leach: I knew it wasn't good for me. It was beyond - -
Questioner: It's not based on anything specific, it's just one of those intangibles you felt?
Leach: It was the intangible it and it was based on the history. I mean - -
. . .
Questioner: Just to summarize, you felt oppressed by the culture and this was - -
Leach: I was oppressed by [Malebranche's] culture, leadership, and style. I didn't feel it, I was.
Questioner: This was also based on your [allegation] that black managers were leaving the company?
Leach: The way she treated black managers. How would you feel every day if you heard someone say "I'm the queen bee, beware of the kiss of the black widow spider?"
Questioner: She said this to everybody; isn't that right?
Leach: She said it publicly.
Questioner: Publicly to blacks and Latinos and every other employee?
Leach: She said it every day [and] she said it often.
Questioner: She wasn't directing that to any one racial or ethnic group or gender, was she?
Leach: You know what, I'm black, so I took it as if she was directing it to me.
. . .
Questioner: Were white people present when she said that? It's a simple question.
Leach: That's not what you asked. Yes, white people were present.
Questioner: She was directing the statement to whoever was in the room at the time; is that correct?
Leach: Yes, but white people weren't being bitten by that black widow spider . . .

Leach, however, was then unable to give any specific examples of how African-Americans were being "bitten" by "the black widow spider," beyond her speculation that Malebranche probably did "peacock dances" when she terminated African-Americans. Leach Dep. at 137-39.

against Malebranche, that is, two specific statements admittedly made by Malebranche, would not be sufficient to raise a rational inference of race or gender discrimination.  First, Worthy places particular emphasis on Malebranche's "offensive" reference to her as another employee's "common law wife" in a 1997 accident report written by Malebranche following her investigation of that other employee.  Pl.'s Mem. in Opp. at 21.  However, plaintiff makes no showing of how this purely descriptive, but obviously offensive, phrase, in itself, is sexist or racist.[10]  Second, Worthy calls the Court's attention to a conversation between Leach and Malebranche in which Malebranche "referenced the fact that [Malebranche's] husband was Haitian."  Leach testified that she found Malebranche's comment during this exchange inappropriate and indicative of Malebranche's "racist" mindset in that she felt the need to bring her husband's race into the conversation.  The Court, however, is not persuaded that any reasonable jury could find Malebranche's passing reference to her husband as a Haitian to be evidence of any race-based discriminatory animus against African-Americans.  Indeed, the fact that Malebranche married a man of African descent, if anything, raises the opposite inference - - *i.e.,* that Malebranche was *not* racist.  *See, e.g., Paddock v. SUNY Brockport*, 418 F. Supp. 2d 288, 292 (W.D.N.Y. 2006)(holding that a supervisor's "innocuous" statement that "I got me a white boy" in reference to her own husband simply could not be construed by a reasonable finder of fact as conveying racial animus towards whites as a class).

In sum, although a thorough review of the record certainly gives indication of bad blood existing between Worthy and Malebranche, there is absolutely no evidence that this apparently

---

[10]Indeed, at her deposition Malebranche noted that she had passingly referenced Worthy in the employee's disciplinary report only after the employee himself had brought up Worthy's name and alluded to their longstanding relationship.  Malebranche also testified that when she was made aware of Worthy's complaints regarding Malebranche's use of the term "common law wife," she had immediately removed the phrase from the report.  Malebranche May Dep. at 33-35.

mutual dislike was based on Worthy's race or sex.[11]  Moreover, even if, as Worthy alleges, Malebranche was unreasonably strict in enforcing FedEx's performance and behavioral policies against Worthy via the issuance of the three reminder/letters and, ultimately, by ordering Worthy's termination, any unequal enforcement of these policies cannot give rise to an inference of impermissible discrimination absent some proffered evidence that Worthy was specifically targeted due to her race or gender.  *See Barriera v. Bankers Trust Corp.*, 2003 WL 22387099, at *6 (S.D.N.Y. Oct. 20, 2003); *cf. Paddock*, 418 F. Supp. 2d at 293 (finding that "[a]t most, plaintiff has shown that [defendant] did not like her as an employee (something not prohibited), but there is insufficient evidence that [defendant's] dislike was based on the fact that plaintiff was white"); *Richardson v. Newburgh Enlarged City School Dist.*, 984 F. Supp. 735, 744 (S.D.N.Y. 1995).

The Court concludes, therefore, that because Worthy has not provided any admissible evidence that would allow a reasonable trier of fact to draw an inference of discrimination as to Malebranche's motivations in terminating Worthy, she has failed to establish the final prong of her prima facie case.  Accordingly, plaintiff's entire claim for discriminatory discharge fails as a matter of law.  *See, e.g., Gonzalez v. Federal Express Corp.*, 1998 WL 289722, at *2 (S.D.N.Y. June 3, 1998); *cf. Baldwin v. North Shore Univ. Hosp.*, 2007 WL 118016, at *3 (E.D.N.Y. Jan. 18, 2007).

### b.  Defendant's Rationale for Discharge

In any event, assuming *arguendo* that Worthy *had* established a prima facie case for

---

[11]For example, although Fichera testified that he remembered a conversation with Malebranche long before she became Worthy's supervisor in which she expressed some dislike for Worthy, he alluded that this dislike may well have been due to Worthy's not-so-diplomatic demeanor.  *See* Fichera Dep. at 16, 27.

discriminatory discharge, thus shifting the burden back to defendant to offer a legitimate, nondiscriminatory rationale for her termination, _McDonnell Douglas_, 411 U.S. at 802-03, defendant would have more than met this burden.  FedEx has advanced several such reasons for Worthy's termination and has submitted powerful evidence supporting its argument that it terminated Worthy because she was not meeting its performance standards at the time of her discharge.  The Mount Vernon facility, for which plaintiff bore the brunt of the responsibility as its senior manager, was the worst-performing station in the Long Island district.  Moreover, FedEx management had received numerous complaints regarding Worthy's abrasive management style.  Malebranche testified that at least three managers at the station had complained to her about Worthy's often imperious, inappropriate, and rude behavior towards others, which she had herself witnessed on several occasions.  Indeed, Thomas, the operations manager at the station, had gone so far as to send a strongly-worded letter to senior management citing specific examples of Worthy's unprofessionalism and lack of respect for others, noting that it was particularly difficult to sit through meetings where "employees [were] referred to as pieces of s--t and to hear profanity blasting every 4 to 5 words."  Last but not least, lower-level employees at the station had also sent a letter to FedEx headquarters in Memphis stating that working with Worthy was "hell" and threatening to strike if FedEx management did not "impeach" Worthy soon.  Def.'s Rule 56.1 Stmt. ¶¶ 81-82; Def.'s App., Vol. 2, Ex. 24, 25.

On the basis of these numerous examples of Worthy's unprofessional behavior, all of which stand unrefuted,[12] Malebranche could easily have concluded that Worthy was unqualified

---

[12]In this respect, the Court notes that several supervisors evaluating Worthy's performance before Malebranche became her supervisor had expressed serious concerns over her demeanor.  For example, in Worthy's 1991 evaluation her then-supervisor, Anita Anderson, noted Worthy's "temper" and the fact that her "presentation and tone of voice can alienate peers and associates . . . [a]s a result she often [loses] their trust and respect."   In 1994, a different supervisor, Thomas Beaury, attached an addendum to Worthy's performance review stating that

for her management position, especially in a station already struggling with high turnover and low employee morale.  *See, e.g., Beyousi v. Bloomingdale's Inc.*, 1998 WL 689939 (S.D.N.Y. Oct. 2, 1998)(holding that plaintiff was not performing job satisfactorily where defendant documented five instances of plaintiff's rude and/or offensive behavior towards colleagues); *Saucier v. Edgewater Construction Co.*, 1994 WL 36363 (N.D.N.Y. Feb. 4, 1994)(finding plaintiff who was rude to co-workers and vendors and who possessed a bad attitude to be unqualified for her position, thus justifying termination).

Because "there is no question that poor performance is a legitimate business reason to fire an employee," *Paddock*, 418 F. Supp. 2d at 295, the Court finds that the above reasons proffered by FedEx are more than sufficient to meet the burden of advancing legitimate, nondiscriminatory reasons for a decision to terminate her.

c. Plaintiff's Burden of Demonstrating Pretext

As noted above, had plaintiff made out a prima facie case of discriminatory discharge, which the Court has found she did not, and had the defendant articulated legitimate, nondiscriminatory reasons for the action taken by FedEx to terminate her, which the Court has found it did, the burden would then shift back to the plaintiff to demonstrate, by a preponderance of the evidence, that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."  *Burdine*, 450 U.S. at 253; *Fisher*, 114 F.3d at 1337.  "A

---

Worthy "appeared to have difficulty adjusting from a one manager operation to working directly with several managers" and that she "demonstrated a lack of respect for others."  Yet another supervisor, Honi Reisman Davis, expressed similar concerns in Worthy's 1995 evaluation, noting that Worthy failed "consider the personal side of the issues" in her dealings with coworkers and that she needed to work on her "interpersonal skills."  *See* Def's App., Vol. 2, Ex. 11.

reason, however, cannot be proved to be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." *Olle*, 332 F. Supp. 2d at 617 (citing *St. Mary's*, 509 U.S. at 515).

Quite simply, Worthy has proffered no evidence that defendant's reasons for its decision to terminate her were false, or that discrimination on the basis of her race or sex was the real reason for her discharge.

Pointedly, Worthy does not contest the fact that she had received a dismally low 1.8 in her most recent performance evaluation, nor that she had also received three warning/reminder letters, in addition to at least two documented counseling letters, within a six-month period concerning her station's declining performance and the need for immediate improvement in a number of operational areas. Although Worthy complains that she was actually performing well considering the circumstances and that Malebranche was simply using her as a "scapegoat" for the station's problems, it is well-established that a "[p]laintiff's subjective opinion about her own performance is insufficient to give rise to a triable issue of fact regarding pretext." *Paddock*, 418 F. Supp. 2d at 295 (citing *Holt v. KMI-Continental, Inc.*, 95 F.3d 123, 130 (2d Cir.1996)); *see also Viola v. Philips Med. Systems of North America*, 42 F.3d 712, 718 (2d Cir. 1994)(noting that an employee's disagreement with an employer's negative evaluations of his performance is not sufficient to establish pretext or support a discrimination claim). The fact that Worthy had received generally positive evaluations from her previous FedEx supervisor, Fichera, does not change the result. *See Brower v. Continental Airlines, Inc.*, 62 F. Supp. 2d 896, 906 (E.D.N.Y. 1999)("a prior positive performance review will not establish that a later unsatisfactory evaluation was a pretext for unlawful discrimination"); *Orisek v. American Inst. of Aeronautics*

*and Astronautics*, 938 F. Supp. 185, 191 (S.D.N.Y. 1996)("a new manager is allowed to appraise an employee's work according to his or her own expectations, even if those expectations are contrary to a prior manager's expectations")(internal citations omitted).

Simply stated, Worthy's conclusory assertions that, in essence, she was the best person for a challenging job and that Malebranche had "exaggerated" her shortcomings in order to "get" her, are unavailing. In the absence of any evidence of impermissible discriminatory motivation on the part of Malebranche, a federal forum is unavailable simply to referee a grudge match over an employee's performance. *See, e.g., Neratko v. Frank*, 31 F. Supp. 2d 270, 284 (W.D.N.Y. 1998)(observing that "[p]ersonal animosity is not the equivalent of . . . discrimination and is not proscribed by Title VII. [A] plaintiff cannot turn a personal feud into a discrimination case by accusation."). The Court, accordingly, finds summary judgment for FedEx warranted as to Worthy's claims of discriminatory discharge arising under Title VII, 42 U.S.C. § 1981, and Article 15 of the New York State Human Rights Law[13] because Worthy has failed to present evidence of circumstances giving rise to an inference of prohibited discrimination. This absence of proof not only leaves her shy in her burden of establishing a prima facie case of discrimination but also shy of showing the existence of a material question of fact about whether FedEx's reasons for discharging her were pretextual.

## IV.  Claims Regarding Retaliatory Discharge

In addition to her claims that she was discharged due to her race and sex, Worthy also asserts that Malebranche terminated her in part as retaliation for her filing of two internal GFTP

---

[13]*See* note 8, *supra.*

grievances against Malebranche.  Compl. ¶ 26.

Title VII prohibits an employer from retaliating against an employee because that employee opposed potentially discriminatory practices of the employer:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a); *see also Burlington Northern and Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405 (2006)(discussing Title VII's anti-retaliation provision).  Claims of retaliation are analyzed using the three-part *McDonnell Douglas* burden-shifting framework.  *Burdine*, 450 U.S. at 252-53 (1981); *Feingold v. New York*, 366 F.3d 138, 156-57 (2d Cir. 2004).

To establish a prima facie case of retaliation, Worthy must demonstrate (1) that she was engaged in a protected activity; (2) that defendant knew of the activity; (3) that defendant took an adverse action against the plaintiff; and (4) that there is a causal connection between the adverse action and the protected activity, *i.e.*, that the defendant had a retaliatory motive.  *Butts*, 2007 WL 259937, at *15; *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 205-06 (2d Cir. 2006); *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 216 (2d Cir. 2001).  Her initial burden in establishing these elements, as noted above, is *de minimis*.  *See, e.g., Hollander*, 172 F.3d at 199; *Abdu-Brisson v. Delta Air Lines*, 239 F.3d 456, 467 (2d Cir. 2001).

Plaintiff, clearly, has satisfied her minimal burden with regard to all the above requirements.  First, even though Worthy had not yet filed a formal complaint with the EEOC and/or with the state human rights commission at the time of her termination, she had filed, via

FedEx's GFTP process, two internal complaints on June 28, 2000 and August 16, 2000 alleging race and sex discrimination on the part of Malebranche. Because Congress, in enacting Title VII, "sought to protect a wide range of activity in addition to the filing of a formal complaint," _Grant v. Hazelett Strip-Casting Corp._, 880 F.2d 1564, 1569 (2d Cir. 1989), complaints filed through a company's internal grievance procedures have been held to constitute "protected activity" within the meaning of the anti-retaliation provision of Title VII. _See, e.g., Kotcher v. Rosa and Sullivan Appliance Ctr., Inc._, 957 F.2d 59, 65 (2d Cir. 1992). The Court, accordingly, concludes that by filing the two internal complaints prior to her termination, Worthy prima facie engaged in a "protected activity."

Worthy has also satisfied the second and third prongs of her prima facie case for retaliation. It is well-settled in the Second Circuit that mere "general corporate knowledge" that a plaintiff had engaged in a protected activity satisfies the knowledge requirement. _Gordon v. New York City Board of Educ._, 232 F.3d 111, 116 (2d Cir. 2000). Thus, even if Malebranche did not immediately learn of Worthy's complaints against her, Worthy's filing of the two formal internal complaints was sufficient in itself to put FedEx on notice that plaintiff was engaged in protected activity. _See, e.g., Alston v. New York City Transit Auth._, 14 F. Supp. 2d 308, 311 (S.D.N.Y. 1998); _cf. Reed v. A.W. Lawrence & Co., Inc._, 95 F.3d 1170, 1178 (2d Cir. 1996)(finding that plaintiff's complaints to an officer of the company had the effect of communicating her concerns to the corporation as a whole). As to the third prong, defendant does not contest the fact that it took an adverse action against Worthy in terminating her.

The analysis, however, is somewhat more complicated with regard to the fourth and final prong of Worthy's prima facie case - - _i.e._, that there was a causal connection between Worthy's

termination and her filing of the two internal complaints against Malebranche.  Proof of causation in retaliation cases can be shown either: (1) directly, through evidence of retaliatory animus directed against a plaintiff by the defendant; or (2) indirectly, by showing that the protected activity was followed closely by discriminatory treatment or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct.  *See Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990); *Moore v. Consol. Edison Co. of New York, Inc.*, 2007 WL 831807, at *7 (S.D.N.Y. Mar. 20, 2007).  While Worthy has not put forth any evidence establishing direct retaliatory animus on the part of Malebranche, the fact that she was terminated on September 13, 2000 - - approximately two and a half months after filing her initial GFTP complaint against Malebranche and less than a month after she filed her second - - nevertheless suffices to satisfy Worthy's burden of showing indirect causation.  *See, e.g., Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 224 (2d Cir. 2001)(noting that the "causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action"); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998)(finding the causal connection requirement to be satisfied simply because the plaintiff was terminated less than two months after the filing of one complaint and ten days after the other).  With this prong met, Worthy has stated a prima facie case of retaliatory discharge.

The burden now shifts back to the defendant to articulate a legitimate, nondiscriminatory reason for Worthy's termination.  *Burdine*, 450 U.S. at 253.  FedEx has, as discussed earlier, provided the Court with several such reasons about which there are no substantial questions of material fact, including the Mount Vernon station's declining performance under Worthy's

management as well as her morale-breaking mistreatment of her subordinates.

This Court must now determine whether the record contains admissible evidence to support and raise a fact question regarding Worthy's contention that FedEx's proffered reasons for her discharge are merely a pretext for retaliation. While this Court has already found Worthy's conclusory assertions of discrimination on the basis of her race and sex insufficient as a matter of law to raise an inference of pretext as to her claim of discriminatory discharge, the considerations are different in a case of retaliatory discharge: "Title VII is violated if a retaliatory motive played a part in the adverse employment actions even if it was not the sole cause, and if the employer was motivated by retaliatory animus, Title VII is violated even if there were objectively valid grounds for the discharge." _Sumner_, 899 F.2d at 209 (internal citations omitted). Moreover, the Court reiterates that on a motion for summary judgment, it must view all the evidence in the light most favorable to Worthy as the nonmoving party. _Anderson_, 477 U.S. at 255. Here, although the evidence of a causal connection between Worthy's filing of the two complaints against Malebranche and her subsequent termination is thin in that it is based only on the close temporal correlation between these events, the fact that Worthy was fired only a month after the filing of her second complaint nevertheless lends credence to Worthy's claim of retaliatory animus on the part of Malebranche and creates an issue of fact as to whether Malebranche terminated Worthy not only for her poor performance but also in retaliation for her participation in a protected activity under Title VII. *See, e.g., Quinn*, 159 F.3d at 770. As such, the Court concludes that summary judgment is not appropriate as to the issue of retaliatory discharge.

## V.  Plaintiff's Claims Regarding Failure to Promote

Worthy also asserts that FedEx discriminated against her on the basis of her race and sex by failing to promote her.  *See generally* Compl. ¶ 35.  For such a claim to survive, a plaintiff must demonstrate that (1) she is a member of a protected class; (2) she applied and was qualified for a job for which the employer was seeking applicants; (3) she was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications.  *Petrosino v. Bell Atlantic*, 385 F.3d 210, 226 (2d Cir. 2004)(internal citations omitted); *see also Butts v. New York City Dep't of Hous. Pres. and Dev.*, 2007 WL 259937, at *10 (S.D.N.Y. Jan. 29, 2007).

While it is undisputed that Worthy, as an African-American and a female, is a member of protected classes, Worthy is unable to establish even a prima facie case as to the remaining three elements.  It is settled law that in order to meet the application requirement contained within the second prong of this test, the plaintiff must submit a "specific application" for a given position.  *Petrosino*, 385 F.3d at 227; *see also Butts*, 2007 WL 259937, at *11 (noting that the "application requirement is not satisfied by a general request to be considered for [a] position").  Worthy makes much of the fact that Malebranche, a high school graduate, advanced through the FedEx ranks much faster than she, a college graduate, did, *see* Pl.'s Rule 56.1 Counter-Stmt. ¶ 3 ("as of 2005, five years after firing [me], Malebranche was still [only] a high school graduate"), but, nevertheless, has not submitted any evidence that she applied at any time for a specific position within FedEx, let alone one for which her application was rejected.[14]  Accordingly, summary judgment is warranted on this claim.

---

[14]Quite to the contrary, Worthy herself notes that she was given numerous promotions between 1984, the year FedEx hired her, and 1996, the year in which she was promoted to senior manager of the Mount Vernon facility. *See* Compl. ¶ 9.

## VI. Assorted Claims Regarding Other Terms and Conditions of Employment

Finally, Worthy makes a number of allegations that, prior to her September 2000 termination, Malebranche and other FedEx officials subjected her to other forms of disparate treatment as to terms and conditions of her employment on account of her race or sex. For example, Worthy complains (1) that she was earning less than white male coworkers at the time of her termination, (2) that Malebranche and other FedEx officials did not devote the proper amount of attention or resources to her station, (3) that Malebranche did not nominate Worthy for any awards during her time supervising Worthy, although she nominated white senior managers for such awards, (4) although Fichera, her former supervisor, did nominate her for an award at one point, she ultimately did not receive it, and (5) that Malebranche refused to communicate with her except via e-mail. *See* Compl. ¶¶ 10, 14, 25; Pl.'s Mem. in Opp.

Although the above allegations of disparate treatment are subject to the same burden-shifting analysis as Worthy's more substantive claims concerning her discharge and failure to be promoted, *see Feingold*, 366 F.3d at 149, the Court need not delve too deeply into them at this stage. They fail as a matter of law for the same reason: plaintiff has not put forth any admissible evidence of discriminatory animus on the part of Malebranche, let alone any other FedEx official.[15] As such, she is unable to establish a prima facie case as to discrimination either on the

---

[15]The Court notes that the record is replete with Worthy's accusations that higher-level FedEx managers in general, and not just Malebranche, were biased against non-whites and women. *See, e.g.*, Compl. ¶¶ 10, 28 (asserting that FedEx's "employment figures and practices demonstrate patterns and employment practices that are racially discriminatory" and giving as an example FedEx's alleged "policy of accommodating white employees' requests not to be assigned to work in 'fear for life' service areas"). Except for Worthy's own self-serving speculation, the record is barren of substantiation for these claims. "Allegations of disparate treatment made without personal knowledge and unsupported by admissible evidence do not satisfy even the minimal burden which a plaintiff faces at the prima facie stage of proceedings." *Wang v. New York City Dep't of Finance*, 1999 WL 529550, at *14 (E.D.N.Y. July 21, 1999), *aff'd* 216 F.3d 1074 (2d Cir. 2000).

basis of her race or her sex. Furthermore, with the exception of Worthy's unsupported allegation that she was earning less than white male coworkers at the time of her termination, even if her other complaints were true, collectively, they do not constitute adverse employment actions in that they consist of nothing more than the "petty slights or minor annoyances that often take place at work and that all employees experience." _Burlington Northern_, 126 S.Ct. at 2415 (citing 1 B. Lindemann & P. Grossman, Employment Discrimination Law 669 (3d ed. 1996), which notes that "courts have held that personality conflicts at work that generate antipathy" and "'snubbing' by supervisors and co-workers" are not actionable under Title VII).

## VII.  Plaintiff's Claims Under Equal Pay Act

Worthy also raises a claim under the EPA alleging that she was earning less than her white male coworkers at the time of her termination. Compl. ¶ 25.[16]  An employer violates the EPA when it pays wages to an employee "at a rate less than the rate at which he pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions."  29 U.S.C. § 206(d); _see also Belfi v. Prendergast,_ 191 F.3d 129, 135 (2d Cir.1999)(noting that "[t]he purpose behind the enactment of the EPA was to legislate out of existence a long-held, but outmoded societal view that a man should be paid more than a woman for the same work").  In order to state a prima facie case under the EPA, a plaintiff must

---

[16]The Court observes that any claims Worthy asserts regarding the circumstances surrounding her 5% salary adjustment in 2000, which apparently occurred after she complained that other senior managers in her newly-assigned district were being paid more than she was, would be barred by the EPA's two-year statute of limitations. _See_ 29 U.S.C. § 255(a).

demonstrate that: (1) the employer pays different wages to employees of the opposite sex; (2) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and (3) the employees perform the jobs under equal working conditions. *See Ryduchowski v. Port Authority of New York and New Jersey*, 203 F.3d 135, 142 (2d Cir. 2000); *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1310 (2d Cir. 1995). "[U]nlike Title VII, the EPA does not require a plaintiff to establish an employer's discriminatory intent." *Ryduchowski*, 203 F.3d at 142.

The only evidence, nonetheless, that Worthy offers in support of her allegations of unequal pay between men and women at FedEx is her unsubstantiated claim, made at her deposition, that male managers in subordinate positions were paid more than she was. Worthy Dep. at 194. However, when asked if she remembered the names or salaries of these managers, Worthy replied that she was unable to recall any specifics, and conceded that her allegations in this regard were based solely on "hearsay" information from other managers and that she had never been able to confirm the information. *Id*. at 194-200. Because Worthy, now after ample opportunity for discovery, has failed to produce any substantiation for her claim that male senior managers were being paid more than she was paid for the same work, plaintiff cannot establish a prima facie case under the EPA. Defendant's summary judgment motion as to the EPA claims must be granted.

## CONCLUSION

For the above reasons, defendant FedEx's motion for summary judgment is granted as to Worthy's claims under Title VII, 42 U.S.C. § 1981, and NYSHRL for discriminatory discharge, failure to promote, and other forms of disparate treatment, as well as to her claims under the EPA. Summary judgment is denied, however, with respect to Worthy's retaliation claim.

The parties are directed to submit, via ECF, a joint pretrial order by April 13, 2007. A final pre-trial conference will be held on April 20, 2007 at 2:30 p.m. Trial will commence on April 30, 2007 at 9:30 a.m.

SO ORDERED.

Dated: Brooklyn, New York
March 30, 2007

/s/Eric N. Vitaliano
Eric N. Vitaliano
United States District Judge